Andre Maldonado, President
Rio Grande Valley Gas, Inc.
209 E University Drive
Edinburg, TX 78539-3547



Judge Mary F. Walrath
United States Bankruptcy Court, District of Delaware
824 North Market Street, 5th Floor
Wilmington, DE 19801
Via postal mail and email due to COVID-19: *Catherine_Farrell@deb.uscourts.gov &
HelpDeskDE@deb.uscourts.gov*
January 28, 2021

**RE:    Ferrellgas Partners, L.P. (Case # 21-10021-MFW) Request for an Official Equity Committee**

Honorable Walrath:

      Rio Grande Valley Gas, Inc. is a holder of record of approximately 33,425 of the common units issued by Ferrellgas Partners, L.P. (OTC: FGPR), which we received when we sold our family propane business to FerrellGas in January 2012. Rio Grande Valley Gas was recognized in Hidalgo County and throughout southeastern Texas for providing safe, reliable and fairly priced propane service to its over 2,500 residential, commercial, and agricultural customers. At the time of the acquisition of our family business, FerrellGas was trading at >$20.00/common unit and we were assured FerrellGas would continue to serve our customers and community while also maintaining a safe and conservative operating profile. Unfortunately, Founder/Chairman/CEO Mr. James Ferrell appears to have broken that promise and I believe an Official Committee of Equity Unitholders must be immediately formed because FerrellGas is a solvent company with significant unitholder value.

      FerrellGas' core propane distribution business and unrivaled BlueRhino portable propane tank franchise are profitable businesses with consistent cash flows, valuable real estate and equipment assets, and almost $300 million in cash as of the most recent quarterly earnings report. I was disappointed to recently learn Mr. Ferrell is attempting to utilize the Chapter 11 bankruptcy process to massively dilute common unitholders after his disastrous $1 billion speculation on the crude oil midstream business from the failure of the Bridger Logistics acquisition in 2015. FerrellGas' Chapter 11 Disclosure Statement also failed to include any financial projections or other standard information, so it is hard to understand what exactly unitholders were even asked to vote on as part of the solicitation process. Even more infuriating, Mr. Ferrell has already paid himself a $3.5 million cash bonus as part of this bankruptcy! In light of these unfaithful action by company insiders, all unitholders must have a seat at the table to determine the future of FerrellGas!

On behalf of the entire Maldonado family, I greatly appreciate your prompt attention to this matter and please let me know if you have any additional questions or requests.

Sincerely-

Andre Maldonado
President, Rio Grande Valley Gas, Inc.

*CC via email*
T. Patrick Tinker, Esq., Assistant United States Trustee, *thomas.p.tinker@usdoj.gov*
David L. Buchbinder, Esq., Trial Attorney, United States Trustee, *david.l.buchbinder@usdoj.gov*

**Appendix A – Preliminary Statement**

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| **FERRELLGAS PARTNERS, L.P.** *et al.,* | **Case No. 21-10021 (MFW)** |
| Debtors. | |

**EMERGENCY MOTION FOR AN ORDER APPOINTING AN OFFICIAL COMMITTEE OF EQUITY**

**SECURITY HOLDERS PURSUANT TO SECTION 1102(A)(1) OF THE BANKRUPTCY CODE**

1.      As a beneficial owner of the common units issued by Ferrellgas Partners, L.P. [CUSIP: 315293100 / OTC: FGPRQ]("FerrellGas" and, collectively with its affiliated debtors, the "Debtors" or the "Company"), *pro se* private investor Kevin Barnes (the "Unitholder") seeks the emergency entry of an order under Section 1102(a)(2) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") directing the immediate appointment of an official committee of equity security holders (an "Equity Committee") in the Debtors' pending Chapter 11 case.

**INTRODUCTION**

2.      The Debtors' own Voluntary Petition for Bankruptcy dated January 11, 2021 proposes to keep common unitholders outstanding, subject to objectively massive and unequitable dilution, and the proposed "Valuation Analysis" by the Debtors' own financial advisor, Moelis & Company LLC, demonstrates over $130 million could be available for distribution to unitholders. These facts are more than enough to prove that FerrellGas is not "hopelessly insolvent" — all that is required to show at this stage to obtain appointment of an equity committee.  Finally, the Debtors' self-interested and fatally-flawed Disclosure Statement, which failed to include any financial projections, details underlying the Moelis analysis or indication of "market testing," proffered by the conflicted Chairman/CEO, Mr. James Ferrell, renders **MUTE** any purported Consent Solicitation.

## **"IT IS ALWAYS DARKEST JUST BEFORE THE DAY DAWNETH"[1]**

3.      While the global COVID-19 pandemic has caused untold human suffering and economic dislocations, FerrellGas is "operationally sound," uniquely situated to continue to benefit from the increasing volumetric propane demand paradigm shift that has occurred in its core markets and has commenced these Chapter 11 cases "to increase its financial flexibility."[i]  First, FerrellGas is the 2nd largest distributor of propane for heating, cooking, and water heaters in the United States, servicing over 700k residential customers in all 50 states.  As working, schooling, fitness, and "nesting" at home appear to be lasting consumer trends after the rapid adoption of web-conferencing and other technologies, residential propane demand will remain elevated as more people are home during the traditional 9-5 and beyond due to home thermostats being kept warmer, more home cooking, and more home hot water usage.  Second, the Company owns the #1 propane tank exchange brand, BlueRhino®, whose portable tanks are used nationwide by residential and commercial customers for BBQing, patio heaters, firepits, and mosquito elimination.  BlueRhino® is distributed at over 62,000 retail locations, including distribution partnerships with FoodLion, Kroger, Lowe's, RiteAd, Walgreens, and Walmart. In FerrellGas' most recent quarterly results ending 10/31/20, the tank exchange volume was +27% YoY[ii] and one only needs to stroll down Market Street in Wilmington to see the vast number of restaurants and cafes now reliant on outdoor seating with propane heaters to stay open for business to understand the significance of this market trend.

4.      These favorable propane demand trends provide a dramatic boost to FerrellGas' financial prospects.  Specifically, FerrellGas' Adjusted EBITDA (a measure of cash flow generation), has improved 30.4% from $230.0m in FY19 to Management's FY21 Budget of "over $300m" and more significantly, as the pre-bankruptcy cleansing materials indicated, the Company is "surpassing

---

[1] Fuller, Thomas.  "A Pisgah Sight of Palestine and the Confines Thereof" (1650), Book II, Chapter XI.

FY21 budget."[iii] Unfortunately, FerrellGas' Chairman/President/CEO, Mr. James Ferrell, along with the conflicted, entrenched, and sycophantic Board of Directors, are attempting to utilize COVID-19 dislocations to consummate at lightning speed a prepackaged Chapter 11 case for the sole benefit of their creditors and insiders.  As proposed, FerrellGas' common unit holders are the **ONLY** voting class facing involuntary impairment, and yet to date have not been provided the representation, or even the information, necessary to ensure their interests in the Company are adequately protected.

5.      While serving as Chairman of the Board of Directors, Mr. James Farrell pursued a disastrous debt-fueled diversification initiation into the crude oil midstream market, including the $124.7M acquisition of Sable Environment, LLC in 2014[iv] and the $837.5m acquisition of Bridger Logistics, LLC in 2015.[v]  These diversification efforts outside core propane markets were an epic failure and were fire-sold for less than $92.0m less than three years later after additional CAPEX spending.[vi]  Unfortunately, these de minimis sale proceeds were not even close to repaying the almost $1bn in incremental debt burden on the Company's balance sheet since this Board of Directors oversight failure. The Bridger acquisition also resulted in multiple lawsuits alleging claims against Ferrellgas and/or the Board of Directors for securities fraud, breach of fiduciary duty, and fraudulent transfers, among others.[vii]

6.      Mr. James Ferrell responsibility for and role in this Chapter 11 proceeding is even more infuriating considering the not one, but TWO pre-petition bonuses awarded on the eve of filing totaling **$3.5m cash** (which included a "signing" bonus despite being with the Company in various management and governance roles since 1965) and a guaranteed $900,000 annual salary for the next two years recently granted by the Company's Board of Directors.[viii]  This draining of valuable cash liquidity on the eve of the Chapter 11 filing represented greater than 10% of the Company's common unit market capitalization at the time of announcement and is further indicative of Unitholder's interests not being adequately represented.

7.      Ferrellgas Partners, L.P., and its publicly traded common units ("HoldCo"), have been structured as a Master Limited Partnership ("MLP") in a jumbled spaghetti of various general partner and limited partner entities that only a restructuring advisor or tax attorney could fully comprehend:



8.      HoldCo is a publicly traded Delaware limited partnership formed in 1994 that has two direct subsidiaries, Debtor Ferrellgas Partners Finance and non-Debtor Ferrellgas, L.P. ("OpCo").  The publicly traded assets of HoldCo are managed by its general partner Ferrellgas Inc. ("FGI"), which is wholly owned by Ferrell Companies, Inc. ("FCI").  A portion of the Company is owned by executive management, directors, and employees (28% of common units and 100% of FCI) through the Company's Employee Stock Ownership Trust ("ESOP").

9.      HoldCo's common units are currently traded on the OTC Market under the symbol "FGPRQ."  HoldCo withdrew its listing of the common units from the New York Stock Exchange effective January 2020, after failing to maintain compliance with its continued listing standards.  As of August 31, 2020, HoldCo had 399 common unitholders of record, and as per the First Day

hearing, over 97,000 individual beneficial holders, primarily small and/or retail investors, whose units are held in "street name" or held by record by banks, brokers and other institutions.

10.     The Company filed their chapter 11 cases on January 11, 2020 (the "Petition Date"). As of the Petition Date, the Debtors' funded debt consisted of $357.0m outstanding principal amount of 8.625% senior notes due 2020 (the "2020 Notes"), which matured on June 15, 2020 and have not been repaid despite the August 15, 2020 expiration of a Forbearance Agreement with selected noteholders.  As of the Petition Date, non-Debtor OpCo has $1.475 billion of unsecured funded debt comprised of: (i) $500 million outstanding principal amount of 6.50% senior notes due 2021 (the "2021 Notes"), (ii) $475 million outstanding principal amount of 6.75% senior notes due 2022 (the "2022 Notes"), and (iii) $500 million outstanding principal amount of 6.75% senior notes due 2023 (the "2023 Notes").  OpCo has also issued on April 16, 2020 senior secured first lien notes due 2025 (the "2025 Notes") in the principal amount of $700 million (the "2025 Notes" and together with the 2021 Notes, 2022 Notes, and 2023 Notes, the "OpCo Notes").

11.     To date, the Unitholder and other holders of FerrellGas common units have not been invited to participate in discussions regarding the HoldCo note maturity, and nor have they been privy to the same information as FerrellGas' insiders and creditors. Since announcing the Transaction Support Agreement on December 11, 2020, the Unitholder has repeated contacted the Debtors and their advisors in an attempt to gather more necessary information (including submitting a formal partnership request pursuant to §17-305 of the Delaware Revised Limited Partnership Act), but has been repeatedly ignored or blocked and hence was force to file this motion.  It is critical all unitholders of FerrellGas be given a fair opportunity to demonstrate what they are entitled to recover on their investments before their interests are improperly and permanently impaired. Without the representation and zealous advocacy of a fiduciary Official Equity Committee in the pendency of the Chapter 11 cases, FerrellGas Unitholders will have no means to preserve and realize the significant value that exists in the Debtor.

### JURISDICITION AND VENUE

**12.** This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (D). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are section 1102(a) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

### FERRELLGAS' PROPOSED RESTRUCTURING

13.    Other than the Debtors' non-insider common unitholders, all other constituents, including the Debtors' creditors and management, stand to greatly benefit from the proposed restructuring. The Debtors are moving on an extremely fast track in these cases having already solicited votes on its proposed prepackaged plan of reorganization (the "Plan") from holders of the 2020 Notes and holders of the Company's existing units utilizing a fatally-flawed Disclosure Statement which fails to include any financial projections, details underlying the Moelis "valuation analysis," or indication of "market testing" of the proposed transaction terms.

14.    The Company's Plan is predicated on a Transaction Support Agreement (the "TSA") between the Debtors and approximately 74% of holders of the 2020 Notes. The TSA sets forth (i) an in-court restructuring process to satisfy the obligations of HoldCo and Partners Finance under the 2020 Notes through the Plan, and (ii) an out-of-court refinancing of OpCo debt, including replacement of OpCo's unsecured 2021 Notes, 2022 Notes, and 2023 Notes, through a new revolving credit facility, $753 million of new OpCo notes, and approximately $525 million of new unregistered preferred equity. The holders of 2020 Notes will have an opportunity to participate in the marketing process for the new preferred equity and to acquire up to 35% of the total amount of such units – an opportunity no extended to current common unitholders. Under the terms of the Plan, the 2020 Notes would be converted into Class B units in HoldCo entitled to receive distributions at a 6:1 ratio to distributions to the Class A units, which would be issued to existing equity, until

6

Class B unitholders receive the principal amount of the 2020 Notes (i.e., $357 million) in distributions. Upon satisfaction of this $357 million distribution threshold or a 1.10x MOIC hurdle, the Class B units would be converted into class A units at a highly dilutive conversion multiple in accordance to the year of conversion (up to 25.00x) for potentially greater than 85% of the pro-forma equity in addition to a full recovery of their principal.

15.     The Company has not obtained any external DIP financing and is proposing to fund the Chapter 11 cases through a prepetition intercompany loan from OpCo instead.  According to the Debtors, HoldCo obtained a binding commitment for a loan in the amount of $19.9 million from OpCo, which loan has an off-market PIK interest rate of 20% (the "OpCo Loan").  The OpCo Loan was made effective at the First Day hearing, will be treated as an intercompany claim under the Plan, and strips additional value away from common unitholder to OpCo noteholders.   The Disclosure Statement states that "[i]n the event expenses exceed the maximum loan amount it is anticipated that funds will be available from OpCo."

16.     Although there is no external DIP lender dictating the fast pace of these cases, the TSA, nevertheless, contains aggressive timing milestones, which include confirmation of the Plan by February 19, 2020 (or less than 45 days after the Petition Date) and emergence from bankruptcy by April 4, 2020.  At the Debtors' First Day hearing, it was abundantly clear that Management has attempted to make HoldCo's in-court restructuring and OpCo's out-of-court refinancing inextricably intertwined, despite FerrellGas' common unitholders not being provided any financial projections for OpCo or other financial information to ascertain the value of its proposed distribution under the Plan.

17.     Next, the Plan includes expansive third-party release and exculpation provisions in favor of the Debtors, OpCo, the current ESOP trustee, consenting creditors, interest holders and the Debtors' officers and directors, including Mr. James Ferrell.

18.     Finally, the Disclosure Statement filed with the Plan provides no information regarding other restructuring alternatives the Debtors have considered at arriving at this proposal or any financial information, including HoldCo's and OpCo's financial projections on which the Debtors' own advisor, Moelis & Company, "Valuation Analysis" is based.   Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see also, In re Quigley* Co., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).  To be approved, a disclosure statement must include sufficient information to apprise stakeholders of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), aff'd, 241 B.R. 283 (E.D.N.Y. 1999)(the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).  As FerrellGas' Disclosure Statement clearly failed to meet this important threshold, any purported Consent Solicitation voting results are inadmissible until all common unitholders have been provided the information necessary to make an informed decision concerning the acceptance or rejection of the proposed Plan.

## FERRELLGAS' ACTIONS AND FILINGS TO DATE:

19.     Based on FerrellGas' filings and actions to date, there can be little doubt that the Board and the Company's Chairman/CEO/President are on the path of appeasing their noteholders at the expense of equity holders in the hopes of confirming a plan that benefits only themselves. As Judge Friendly remarked, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right."  *In re Ira Haupt & Co.*, 361 F. 2d 164, 168 (2d Cir. 1966).  The

Debtors' process to date and proposed restructuring seem to be far from that.  By way of a few examples:

20.    On December 30, 2020, the Debtors disclosed that its Chairman and "interim" President and CEO, Mr. Ferrell will assume the role of President and CEO of the general partner FGI effective December 31, 2020 and will be paid an annual base salary of $900,000.  In addition, Mr. Ferrell received a "signing bonus" of $2.0m and a one-time bonus of $1.5m for his efforts in overseeing the execution of the TSA, amounting to more than 10% of the Company's market capitalization and despite being with the Company in various executive and governance roles since 1965.  While the common unit holders are being effectively diluted into obscurity under the proposed Plan, Mr. Farrell's bonus payments dwarf any costs associated with the appointment of an Official Equity Committee.

21.    The Debtors are not insolvent and according to their own valuation expert, there is likely substantial value available for equity holders.  According to the Debtors, the Company has been outperforming its projections and its adjusted EBITDA is expected to grow to over $300m by FY2021[ix] versus the current outstanding debt annual interest expense of $199m.  On December 15, 2020, the Debtors also reported adjusted EBITDA of $33.9m for the first quarter ended October 31, 2020, a 35% increase from $25.1m reported from the prior-year period.[x]  On December 21, 2020, the Debtors commenced solicitation of votes on its Plan with the accompanying Disclosure Statement.  The Disclosure Statement provides little to no information to inform stakeholders' vote, including a total lack of financial projections and other relevant financial and background data.  While the Disclosure Statement includes a valuation analysis (the "Moelis Valuation Report") from the Debtors' financial advisors Moelis & Company, LLC ("Moelis"), given the lack of underlying data, its reliability is impossible to test at this stage.  Even so, on its face the Moelis Valuation Report demonstrates a potential equity value available for distribution to common

unitholders of over $130 million when using Moelis' $488 million HoldCo enterprise valuation calculation.

22.    The Debtors' equity-owning officers and directors are conflicted and appear to have shielded themselves from any liability.  Unlike a traditional NYSE listed C-Corp, the terms of the Company's partnership agreements fully waive and disclaim any fiduciary duties by general partner to common unitholders, leaving them with no ability to protect their interests and/or challenge any potential breaches of fiduciary duty or other mismanagement.  Even worse, recent Company litigation with the former ESOP trustee (discussed below) shines light on how entrenched the current Board is and its efforts to protect itself from any oversight by blocking any proposals for appointment of special independent committees or refreshment of the Board of Directors members after significant business judgement failures.

23.    The foregoing highlights are only the tip of the iceberg as to why the immediate appointment of an Official Equity Committee is required for these Debtors.  With this factual backdrop, the below sets out the relevant factors that justify an Equity Committee appointment.

## **ARGUMENT**

24.    As the facts set forth herein demonstrate, FerrellGas' common unitholders are entitled to, and the Unitholder respectfully requests, the immediate appointment of an Official Equity Committee. Section 1102(a)(2) of the Bankruptcy Code provides that, upon the request of a party-in-interest, the court may appoint an official committee of equity holders if "necessary" to provide "adequate representation" of the interests of the equity holders. 11 U.S.C. § 1102(a)(2). In providing common unitholders the ability to seek appointment of an equity committee, Congress' legislative intent recognized that minority investors in Chapter 11 could be particularly vulnerable, and an equity committee could be required to "counteract the natural tendency of a debtor in

distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." S. Rep. No. 95-989, at 10 (1978), attached hereto as **Exhibit A.**

25.     The Court's determination of the need for an Equity Committee is unfettered and *de novo*, without regard to any determination on such matter by the U.S. Trustee. In re Park West Circle Realty, LLC, No. 10-12965 (AJG), 2010 WL 3219531, at *2 (Bankr. S.D.N.Y. Aug. 11, 2010) (a court reviews *de novo* a decision of the U.S. Trustee not to appoint an additional committee); In re Enron Corp., 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) (same).

26.     Courts in this District and elsewhere have developed several criteria in determining whether to appoint a statutory equity committee:  (i) whether the Debtors appear "hopelessly insolvent" (which they are not); (ii) whether the interests of equity holders are adequately represented absent the appointment of a statutory equity committee (which they are not); (iii) the complexity of the case (*inter alia*, the Debtors are the second largest provider of propane in the United States); (iv) whether the equity is widely held and actively traded (it is as there are approximately 399 common unitholders of record, which does not include a substantially greater number of holders in "street name" and the daily average trading volume over the past three months has been over 300,000 shares); (v) the time of the request in relation to the procedural posture of the case (this is clearly the optimal time to appoint an Equity Committee); and (vi) whether the administrative costs of the statutory committee outweigh the benefit of adequate representation (there are very substantial equity interests here and costs of having an Equity Committee are dwarfed by the $3.5 million cash bonuses received by Mr. Ferrell alone in addition to over $16 million of projected professional fees for the Debtors and noteholder professionals ). *See, e.g., In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009); *Exide Tech. v. State of Wisconsin Inv. Bd.*, 2002 WL 32332000, at *1-2 (D. Del. Dec, 23, 2002); *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996); *In re Eastman Kodak Co.*, No. 12-10101, 2012 WL 250107, at

11

*1-3 (Bankr. S.D.N.Y. June 28, 2012); *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216–22 (Bankr. N.D. Tex. 2009); *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 219-20 (Bankr. S.D.N.Y. 2002).

27.     No single factor is dispositive, and the weight attributed to each factor is determined by the facts of each case. *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600-01.  Furthermore, even if the Debtors were clearly insolvent, which is not the case here, this would not bar the appointment of an Equity Committee.  *See 7 Collier* on Bankruptcy P 1102.03 (16th 2020) ("solvency of the debtor should not be the only factor, or even the principal factor, in deciding whether to appoint a committee of equity security holders.  In many chapter 11 cases, only the passage of time and the debtor's attempt to restructure its business will determine whether a recovery will be available for equity.").  As discussed below, each of the factors weighs heavily in favor of the appointment of an Equity Committee.

**i) The Debtor are Far From "Hopelessly Insolvent:" According to at Least 5 Metrics, Common Unitholders are Plausibly in the Money**

28.     The applicable legal standard with respect to the solvency prong for an appointment of an Equity Committee is not whether the Debtors are insolvent but whether they "appear[] to be hopelessly insolvent."  *In re Williams Commc'ns Grp., Inc.*, 281 B.R. at 220-21; *In re Wang Labs, Inc.*, 149 B.R. 1, 3 (Bankr. D. Mass. 1992) (bankruptcy court appointed official equity committee even though the company was operating "at a loss," because the debtor was "not hopelessly insolvent").  Here, the Debtors are far from being "hopelessly insolvent."  This fact is a significant factor supporting the immediate appointment of an Equity Committee.  Value, as evidenced by the Company's SEC and case filings, is sufficient to support a finding of solvency in the context of committee appointment.  See *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009).

29.     There are at least five publicly observable, data-based metrics which demonstrate common unitholders are plausibly in the money, including, but not limited to:

- Debtors' Moelis valuation report

- Recent improvements in operational and financial performance

- Recent business results are exceeding management projections

- Propane distribution public company trading comparables

- Precedent propane distribution company transaction comparables

30.     First, while the Disclosure Statement failed to include any financial projections or even committed financings, the Debtors did file a flimsy Moelis Valuation Report, which shows a total enterprise value for the Debtors between $2 million and $488 million, with a midpoint of $245 million, as of an assumed effective date of January 31.[xi]   Moelis states that it used a combination of publicly traded comps, precedent transactions and discounted cash flow analysis. However, no underlying supporting detail, including peer companies, peer transactions, cash flow discount rate, terminal value perpetuity growth rate assumptions, or HoldCo's and OpCo's financial projections have been provided in the Disclosure Statement.  Even so, the Moelis Valuation Report demonstrates that over $130 million could potentially be available for distribution to equity holders using the $488 million HoldCo enterprise valuation calculation.

31.     Second, on December 15, 2020, the Debtors reported that their adjusted EBITDA has increased by 35% for the first quarter ended October 31, 2020 as compared to the prior year period.[xii]  This is not surprising given that the Debtors have significantly benefited from the COVID-19 related nesting at home, which spurred significant volumetric demand for the Company's propane for heating, cooking, and outdoor heating equipment from both homeowner and commercial segments.  This favorable operating environment seems to have continued into 2021 as United States propane stocks are currently at 5-year lows, with less than 32 days of supply available versus great than 56 days of supply at this time last year.[xiii]

32.    Third, the Debtors' own Cleansing Materials filed in connection with their entry into the TSA show that the Debtors are far from "hopelessly insolvent."  The Debtors disclosed that:

- budgeted adjusted EBITDA [is] expected to grow to over $300 million by FY2021 (versus current annual interest expense of approximately $199 million), which would represent an 8.4% CAGR since Jim Ferrell's return as CEO in 2017;

- successful management of operating expenses has increased Adjusted EBITDA margin from 11.4% in FY 2017 to 17.8% in FY 2020; and

- the Company is already surpassing FY 2021 budget."[xliv]

33.    Fourth, as per below, as of the trading close on 01/28/2021, North American propane distribution public company trading comparables indicate FerrellGas common unitholders are significantly in the money. Utilizing the consensus I/B/E/S estimates mean FY21 FV/EBITDA multiple of 8.3x, FerrellGas' most recent 10-Q for net debt [$2,207million] and units outstanding [98.1], and FerrellGas' FY21 budgeted Adjusted EBITDA of $300 million, this implies FerrellGas' common units are worth approximately **$2.84/unit**, or an implied equity value of $279 million.[xv]

| Company | Ticker | Share Price | Market Cap. | Firm Value | LTM EBITDA Margin | FV Revenue LTM | FV Revenue FY21E | FV EBITDA LTM | FV EBITDA FY21E |
|---|---|---|---|---|---|---|---|---|---|
| *North American Propane Distributors* | | | | | | | | | |
| UGI Corporation | UGI US Equity | $36.42 | $7,629 | $13,662 | 23.0% | 2.1x | 1.9x | 9.0x | 8.6x |
| Superior Energy | SPB CN EQUITY | $12.35 | $2,174 | $4,061 | 20.0% | 1.6x | 1.7x | 8.1x | 8.2x |
| Suburban Propane Partners, L.P. | SPH US Equity | $15.06 | $941 | $2,148 | 22.9% | 1.9x | 1.9x | 8.5x | 8.1x |
| | | | Max | $13,662 | 23.0% | 2.1x | 1.9x | 9.0x | 8.6x |
| | | | Mean | $6,624 | 22.0% | 1.9x | 1.8x | 8.5x | 8.3x |
| | | | Min | $2,148 | 20.0% | 1.6x | 1.7x | 8.1x | 8.1x |
| Ferrellgas Partners, L.P. | FGPR US Equity | $0.5250 | $52 | $2,258 | 18.2% | 1.5x | N/A | 8.2x | 7.5x |

34.    Finally, as per below, precedent North American propane distribution company transaction comparables for deals great than $200 million indicate FerrellGas common unitholders are significantly in the money.  Utilizing the mean Next Twelve Months (NTM) FV/EBITDA transaction multiple of 9.0x, FerrellGas' most recent 10-Q for net debt [$2,207million] and units outstanding

[98.1], and FerrellGas' FY21 budgeted Adjusted EBITDA of $300 million, this implies FerrellGas' common units are worth approximately **$5.10/unit**, or an implied equity value of $501 million.[xvi]

| Buyer | Seller | Target | Transaction Date | Transaction Value | LTM EV/EBITDA | NTM EV/EBITDA |
|---|---|---|---|---|---|---|
| UGI Corporation | AmeriGas Partners, L.P. | Retail Propane Operations | 04/02/19 | $2,440 | 10.2x | 9.7x |
| Superior Plus Corporation | NGL Energy Partners LP | Retail Propane Operations | 05/30/18 | $900 | 10.5x | 10.7x |
| DCC LPG | NGL Energy Partners LP | Retail West | 11/07/17 | $200 | 8.0x | 7.1x |
| Superior Plus Corporation | Gibson Energy Inc. | Canwest Propane | 02/13/17 | $412 | 10.8x | 12.3x |
| Suburban Propane Partners, L.P. | Inergy, L.P. | Retail Propane Assets | 04/26/12 | $1,800 | 9.1x | NA |
| AmeriGas Partners, L.P. | Energy Transfer Partners, L.P. | Heritage Propane | 10/17/11 | $2,890 | 11.4x | 8.9x |
| Inergy Propane, LLC | Sterling Partners GP LLC | Liberty Propane | 01/04/10 | $223 | NA | 6.2x |
| Inergy, L.P. | Star Gas Partners, L.P. | Star Gas Propane | 12/17/04 | $475 | 9.6x | 9.5x |
| Ferrellgas Partners, L.P. | Blue Rhino Corporation | Retail Tank Exchange | 02/09/04 | $420 | 10.0x | 7.8x |
| | | | Max | $2,890 | 11.4x | 12.3x |
| | | | Mean | $1,084 | 10.0x | 9.0x |
| | | | Min | $200 | 8.0x | 6.2x |
| Ferrellgas Partners, L.P. - Current Market Valuation | | | | $2,258 | 8.2x | 7.5x |

## ii) The Common Unitholders are NOT Adequately Represented

35.    The law does not envision that a chapter 11 debtor or an official creditors' committee will adequately represent the interests of shareholders in the bankruptcy case.  *In re Mirant Corp.*, 334 B.R. 800 at 815 (noting that it is unlikely that creditors will be disposed to value Debtors so liberally that equity may be sure to receive its due); *In re Coram Healthcare Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004) ("we recognize each side's incentives to either overvalue or undervalue the Debtors").  Chapter 11 debtors are not expected to protect shareholders because conflicting concerns often arise making it difficult for such directors and management (even assuming the best of intentions, which does not seem warranted here) to follow the best course for non-insider public shareholders.  *See In re Pilgrim's Pride Corp.*, 407 B.R. at 218 ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors . . . the reorganization process is not so simple that ensures shareholders are adequately represented by equity-owing management.").  The facts here show that Company's officers and directors cannot be relied upon in any fashion to "adequately represent" the interests of equity holders.

36.    There is no dispute that equity-owning officers and directors cannot adequately represent shareholders due to their conflicting fiduciary duties to creditors in a bankruptcy and other possible conflicts of interests.   Once a bankruptcy petition has been filed, the Debtor's directors and officers have a broadened fiduciary duty to the estates as a whole, not only the Unitholders. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). This often creates conflicts in interest to the detriment of equity holders. See *Pilgrim's Pride*, 407 B.R. at 218-19 ("The dynamics of Chapter 11 are such that Debtors-and their management-are likely to be constrained to accept and advocate to the court a conservative value for their business in order to obtain creditor assent to a reorganization plan"); Addendum at 2.  Moreover, in a similar energy MLP Chapter 11 case, the United States Securities and Exchange Commission opinioned *In re Breitburn Energy Partners LP*, No. 16-11390, (S.D.N.Y. Oct. 7, 2016), ECF No. 650, attached hereto as **Exhibit B** ("As for management, it is the [SEC] staff's view that equity-owning officers and directors generally cannot adequately represent shareholders due to their conflicting fiduciary duties to creditors in a bankruptcy and other possible conflicts of interest (i.e. **management incentive and retention plans**).").   More significantly, unlike most publicly traded companies, it appears FerrellGas' current Chief Operating Officer, Chief Financial Officer, Chief Sales Officer, and General Counsel all fail to currently own a single common unit of the Debtors.[xvii]

37.    Because FerrellGas is structured as an MLP with separate and divergent GP/LP interests, it is important to review Founder/Chairman/CEO Mr. James Ferrell's economic motivations and how they are in direct conflict with common unitholders under the proposed Plan.  First, although Mr. James Ferrell is a holder of ~4.76m common units of FerrellGas (4.9% of outstanding), he has been a net seller of common units since going public in 1994 and his stake has a current market value of only $2.50 million.[xviii]  Thus, Mr. Ferrell's $3.5 million in pre-petition cash bonuses were **40% GREATER** than his overlapping ownership interest with common unitholders.  Most telling, the proposed Plan does not require any material concessions or majority governance changes for the

partnership agreements or structure with Ferrell Companies, Inc.  While Mr. Ferrell's GP interests are effectively unimpaired, the massive and unequitable dilution facing common unitholders further illuminates the divergent interests the Bankruptcy Court is tasked with overseeing.  In summary, it is inconceivable Mr. Ferrell is appropriately motivated to look out for the interest of FerrellGas common unitholders going forward in the Chapter 11.

38.    Next, under FerrellGas' current partnership agreements, the general partner upstreams to Ferrell Companies, Inc. (a Kansas company), an annual reimbursement for "all direct and **INDIRECT** expenses" made on behalf of Ferrellgas Partners, L.P.  While the details and suitability of these payments are thinly disclosed in the Company's SEC filings, it is highly concerning this massive cash vacuum has risen to $290.3 million for fiscal 2020, up from $245.0 million in fiscal 2015, reaching 19% of total revenue versus the historic 10-12%.[xix]  It is also interesting to note this dramatic increase in cash upstreaming accelerated after the termination in FY17 of the quarterly cash distributions to paid to common unitholders.  As there will be no UCC in this Chapter 11, only an Official Equity Committee can independently and vigorously investigate the suitability of this significant expense reimbursement agreement to ensure this recent >$45 million increase in annual expenses is in the best interest of the Debtors going forward and that no pre-petition fraudulent conveyance or other financial shenanigans have occurred.



39.     Even more shocking, FerrellGas' relevant partnership agreements expressly waived and eliminated any fiduciary duties by the general partner to any unitholder.[xx]  Generally (unless a partnership agreement otherwise provides, as is the case here), Delaware law requires a general partner of a Delaware limited partnership to adhere to fiduciary duty standards under which it owes its limited partners the highest duties of good faith, fairness and loyalty and which generally prohibit the general partner from taking any action or engaging in any transaction as to which it has a conflict of interest.  The partnership agreements of both HoldCo and OpCo unconditionally eliminate these default fiduciary duty standards and require the general partner to adhere to the contractual good faith duty of care set forth in those agreements.  Specifically, the general partner need only take actions that it, as general partner, reasonably believes to be in, or not inconsistent with, the best interest of HoldCo and OpCo.  Thus, neither HoldCo nor OpCo owes traditional fiduciary duties to any equity holder.  According to the Debtors' own fiscal year 2020 Form 10-K, "[t]he latitude given in the partnership agreements to [the] general partner in resolving conflicts of interest may significantly limit the ability of a unitholder to challenge what might, in the absence of the partnership agreement provisions eliminating default fiduciary duties be a breach of fiduciary duty."[xxi]

40.     Unfortunately, many individual retail investors [greater than 70% of the LP unitholders in FerrellGas] and the retail stockbrokers that service their accounts are under the vestigial impression that, like most NYSE listed companies [such as FerrellGas originally], the Company's management and Board of Directors has a fiduciary duty to act in the interest of all shareholders.  Because of this mistaken assumption regarding FerrellGas' governance and the lack of adequate financial information, including the projections underlying the Moelis Valuation Analysis in the Disclosure Statement, it is not surprising default votes in favor of the Debtors' recommendation for the solicitation materials were received.  In addition, because the MLP tax structure precludes many larger institutional investors from participating in FerrellGas, there was not an independent

review and recommendation based on the purported "Disclosure Statement" by Institutional Shareholder Services, Inc. (ISS), Glass, Lewis & Co., LLC (Glass Lewis), or even a cornerstone active investor such as Franklin Templeton, Fidelity, or T. Rowe Price.

    41.    While serving as Chairman and then also as President and CEO of the Company, Mr. Ferrell has been on a value-destructive path since overseeing the 2015 acquisition of Bridger Logistics LLC ("Bridger"). The Company has vigorously resisted any appeal for transparency and Board independence. In 2015, the Company borrowed $500 million to acquire Bridger, a midstream energy transportation company, for approximately $820 million total consideration in a cash and stock deal.[xxii] Bridger never generated enough cash flow to service this new debt and the Company ended up fire-selling most of it two years later for $92 million, locking in a huge loss. Ferrellgas's unit price, which reached a high of $28 per unit in 2014, has been plunging since this disastrous attempt at diversification. Fast-forward a few years, and Mr. James Ferrell sought to remove the independent ESOP trustee (GreatBanc Trust Company) by filing a lawsuit in October 2019, alleging the far-fetched claim that the independent ESOP trustee was responsible for the operational and financial failure of the Bridger transaction.[xxiii] However, according to the much more credible ESOP trustee response to the lawsuit, Mr. James Farrell's actions were spurred by the ESOP trustee's request to appoint a special committee in the summer of 2019 to consider a recapitalization proposal from a reputable global asset management firm and other strategic proposals that would have revived the Ferrellgas unit price before any HoldCo or OpCo debt defaults.[xxiv] According to the ESOP trustee, the Board refused to form a special committee or even consider the proposed recapitalization, ultimately removing the ESOP trustee and replacing it with a new "trustee" personally selected by Mr. James Ferrell. This new "trustee," Mr. James Urbach, is a solo practitioner with no other publicly traded company ESOP clients who works out of a private residence in coastal Florida.



Mr. James Ferrell's vexatious litigation with the now former ESOP trustee, GreatBanc Trust Company, for attempting to serve its fiduciary role to the benefit of all employee owners, is still ongoing, after already being dismissed once and failing at the appellate level, at great continuing expense and distraction to the Debtors.

42.    Next, given the complicated master limited partnership structure of the Debtors, it remains unclear if the unitholders will liable for taxable income from the cancellation of its indebtedness ("CODI") by virtue of the proposed restructuring, while at the same time receiving no cash distributions to pay this potential tax liability.   The Disclosure Statement plainly says that the "Debtors may incur COD income as a result of the implementation of the Plan [and that] HoldCo and/or [Partners Finance] may incur COD income as a result of satisfying Allowed Class 4 Claims [2020 Notes Claims] by issuing New Class B Units to the Holders of those Claims."[xxv]   These significant CODI tax issues facing all unitholders will require further due diligence and analysis with the assistance of qualified and independent tax professionals.

43.    Thus, under the circumstances far less troubling than those that exist here, in *Oneida*, Judge Gropper determined that it would be "unrealistic" to rely on "the usual presumption that the

Board will pay due . . . regard to the interests of shareholders." *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576 at *2 (Bankr. S.D.N.Y. May 4, 2006). There, the debtor's lenders, as part of out-of-court restructuring, gained effective control of the debtor's board through exercising the right to appoint six of the nine directors. Judge Gropper found that the absence of the "usual checks and balances" present in most bankruptcy cases and "due regard for appearances" warranted the appointment of an official equity committee. *Id.* at *3.

### iii) The Debtor's Cases are Undeniably Large and Complex

44.    There can be no serious challenge to the fact that these cases are large and complex. According to the Debtors' own statements, the Debtors, together with OpCo and its subsidiaries, are "the second largest marketer[s] of propane in the United States as measured by the volume of retail sales in fiscal year 2020 and a leading national provider of propane by portable tank exchange."[xxvi] FerrellGas has over 4,000 fulltime employees and maintains over 59,500 tank locations and 906 service units around all 50 states of the United States.[xxvii] For the fiscal year ended July 31, 2020, the Debtors' total operating revenues were approximately $1.49 billion.[xxviii] The Debtors' consolidated assets and current liabilities as of October 31, 2020 were approximately $1.652 billion and $1.118 billion, respectively.[xxix] The complexity of these cases clearly militates in favor of an Equity Committee appointment. *See In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985) ("[T]he complex nature of this large case requires representation of . . . shareholders . . . [T]his is not a case where the . . . shareholders will be asked merely to vote on a plan. This is a case requiring active participation by . . . shareholders to protect their interests.").

45.    In the case of this size and complexity, it is unlikely that any single unitholder or group of unitholders would have sufficient expertise and resources to adequately represent the interests of all unitholders. It would be unfair and impractical to demand that this signle *pro se*

unitholder continue to individually bear all the time and costs of representation to address the multitude of relevant issues that will arise in these chapter 11 cases.

### iv) FerrellGas Common Units are Widely Held and Actively Traded

46.    HoldCo is a publicly traded company with approximately 97.2 million common units outstanding as of October 31, 2020.[xxx]  As of August 31, 2020, FerrellGas had approximately 399 common unitholders of record and as per the Debtors' First Day hearing, over 97,000 individual beneficial holders, primarily small and/or retail investors, whose units are held in "street name" or held by record by banks, brokers and other institutions.

47.    . FerrellGas common units are listed and traded on the OTC Pink Market under the symbol "FGPRQ" and were previously listed on the New York State Exchange under the symbol FGP.  Furthermore, over 70% of units are widely held by smaller or retail holders, who may not be easily organized to voice their interests in these chapter 11 cases, let alone become educated as to the means to obtain a recovery in an expediated case unfolding during the pandemic.  This factor weighs in favor of appointing an Equity Committee.

48.    The Unitholder, in their personal capacity as a private investor, is currently the beneficial owner of approximately 250,500 common units of FerrellGas.[2]  In light of their position as a beneficial owner of Ferrellgas common unitholders, the Unitholder is ready and willing to serve on the Equity Committee should one be appointed.  In addition, the Unitholder is currently aware of 2-3 other unitholders of FerrellGas who have expressed an interest in protecting common unitholder rights and serving on the Equity Committee should one be promptly appointed.

49.    In order to be adequately represented in this Chapter 11 case, an Official Equity Committee must be appointed due to the sheer number of unitholders and difficulties in coordinating, including regarding the Consent Solicitation, outside of official FerrellGas management channels to

---

[2] Additional documentary evidence certifying the Unitholder's beneficial ownership of Debtors common units can be expeditiously produced to the Court or the U.S. Trustee upon their request.

date.  The Debtor has commenced discussions with stakeholder constituencies regarding critical issues, including valuation and the recapitalized balance sheet at both OpCo and HoldCo. Thus far, the numerous and widely dispersed common unitholders have not participated in those discussions, nor have they been privy to the same information as the Company's creditors. Without representation through an Official Equity Committee, Unitholders will continue to be denied critical information and the opportunity to advocate to preserve the value of the Debtor's equity.

### v)  An Equity Committee Appointment Will Not Unduly Delay These Cases

50.    The Debtors just filed their chapter 11 cases on January 11, 2020 and have not yet held a second day hearing.  This request is clearly at the very beginning of the cases and thus, timely.  *See In re Pilgrim's Pride Corp.*, 407 B.R. at 219-20 (noting that because the debtors were finalizing their business plan, "establishment of an advocate for shareholders is urgent" and "[d]enying equity owners the means to analyze and critique Debtors' projections in their business plan is likely to hinder if not hopelessly ripple any later effort to show that Debtors' value is sufficient to justify equity participation"); *In re Energy XXI, Ltd.*, No. 16-31928 (Bankr. S.D. Tex. June 15, 2016), Hearing Transcript, at p. 147 [Dkt No. 532] (an equity committee must be "involved early if [the court is] going to let them get involved at all").

51.    Now is the time to appoint an Equity Committee, so that any such committee will have the benefit of time and resources at the early stages of these cases and not have to engage in a deep learning curve later on to make any meaningful contribution.

### vi) The Clear Benefits of an Equity Committee Outweighs Incremental Administrative Costs

52.    Given the overall size and complexity of these chapter 11 cases, the incremental cost of an Equity Committee – compared to what is likely to be very significant estate funded costs for other professionals – does not outweigh the need for adequate representation for equity holders, especially in light of the equity holders' potential personal tax liability exposure due to

CODI.  The costs of an Equity Committee are dwarfed alone by $3.5 million in cash bonuses already received by the Debtors' Chairman and CEO Mr. James Ferrell.  In addition, the Debtors' Disclosure Statement estimates $8 million for the Debtors' professional fees for only a three-month period from January to April 4 and over $8.2 million for consenting noteholder professional fees during that same period.[xxxi]

53.    The case law is clear that the administrative costs of an official equity committee alone must not bar statutory committee appointment.  *See In Re McClean Indus.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive . . . security holders of representation.").

54.    Furthermore, the Bankruptcy Code contains adequate means for controlling costs.  At all times, the costs of the Equity Committee professionals would be subject to review by parties in interest.  And the Court has complete control over the expenses of an Equity Committee.  In any event, because common unit holders here are in the money, the fee burden ultimately will be borne by the same unitholders.

55.    For all the foregoing reasons, the Unitholder believes it would be unjust to permit the Debtors to prosecute a plan of reorganization without the input of their Unitholders, and accordingly seeks the immediate appointment of an Official Equity Committee to protect the interests of all equity holders.

## Conclusion

The Unitholder respectfully requests that the Court direct the U.S. Trustee to immediately appoint an Official Equity Committee of common unitholders in this case and grant such other relief as is just.

Kevin Barnes

Kevin Barnes, *pro se*

4030 S. Whitehorse Road, #408

Malvern, PA  19432

kevinrbarnes@gmail.com

1.646.265.9535 - direct

January 29, 2021

**Appendix B – Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------
In re:                                            |        Chapter 11
                                                  |
Ferrellgas Partners, L.P., *et al.,*              |        Case No. 21-10021-MFW
                                                  |
Debtors.                                          |        _____
------------------------------------------------------------

**ORDER DIRECTING THE UNITED STATES TRUSTEE TO APPOINT**
**AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

Upon the motion (the "Motion")[3] of the Unitholder for entry of an order directing the Office

of the United States Trustee for the District of Delaware (the "U.S. Trustee") to appoint an official

committee of equity security holders; and it appearing that this Court has jurisdiction over the

matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b); and it appearing that venue

of this chapter 11 case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and

this Court having determined that the relief requested in the Motion is appropriate pursuant to 11

U.S.C. §1102(a)(2); and it appearing that proper and adequate notice of the Motion has been given

and that no other or further notice is necessary; and after due deliberation thereon, good and

sufficient cause appearing therefore;

**IT IS HEREBY ORDER THAT:**

1.  The Motion is GRANTED as set forth herein.

2.  The U.S. Trustee is directed to immediately appoint an official committee of equity

    security holders in this case.

---

[3] Terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion

3.  This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation and implementation of this Order.

Dated: January \_\_\_\_, 2021
Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

2

**EXHIBIT A**

## BANKRUPTCY REFORM ACT OF 1978
P.L. 95-598

## BANKRUPTCY REFORM ACT OF 1978

*P.L. 95-598, see page 92 Stat. 2549*

House Report (Judiciary Committee) No. 95-595, Sept. 8, 1977
[To accompany H.R. 8200]

Senate Report (Judiciary Committee) No. 95-989, July 14, 1978
[To accompany H.R.S. 2266]

Cong. Record Vol. 124 (1978)

### DATES OF CONSIDERATION AND PASSAGE

House February 1, September 28, October 6, 1978

Senate September 7, 22, October 5, 1978

The House bill was passed in lieu of the Senate bill after amending its language to contain much of the text of the Senate bill. The Senate Report (this page) and the House Report (p. 5963) are set out.

### SENATE REPORT NO. 95-989

[page 1]

The Committee on the Judiciary, to which was referred the bill, S. 2266, to establish a uniform law on the subject of bankruptcies, having considered the same, reports favorably thereon and recommends that the bill in the nature of a substitute do pass. The committee amendment strikes out all after the enacting clause and inserts a new text, which appears in italic type in the reported bill.

### PURPOSE OF THE BILL

The purpose of the bill is to modernize the bankruptcy law by codifying a new title 11 that will embody the substantive law of bankruptcy and to make extensive amendments to title 28, Judiciary and Judicial Procedure, that will encompass the structure of the revised bankruptcy courts.

### PURPOSE OF THE AMENDMENT

The amendment in the nature of a substitute reflects testimony received by the committee and the changes that resulted. The purpose of the revised bill remains to modernize the bankruptcy law.

### INTRODUCTION

In 1970, Congress created the Commission on the Bankruptcy Laws of the United States to study and recommend changes in bankruptcy laws. The Commission became operational in June 1971, and filed its final report with Congress on July 30, 1973. Its report was in two parts. Part I contained the Commission's findings and recommendations.

5787

# LEGISLATIVE HISTORY
### P.L. 95-598

[page 10]

serve the same essential purpose. The differentiating standard is not whether the debtor is large or small. It is rather whether the debtor is a public company, as defined.

Reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors and stockholders. In a large public company, whose interests are diverse and complex, the most vulnerable today are public investors who own subordinated debt or equity securities. The bill, like chapter X, is designed to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors.

Statistical information provided by the SEC (Hearings before Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, U.S. Senate, on S. 2266 and H.R. 8900, 95th Cong., 1st Session, hereinafter (Senate hearings, pp. 623, 632) ), indicates that the overwhelming majority of reorganization cases would not involve public companies as defined in section 1101(3) of the bill. Reorganization of such companies would be governed by procedures and standards that are drawn and adapted from what is now chapter XI. But the few exceptions—the public companies—are of vast importance. As the SEC noted (Senate hearings, supra) public companies, as defined in section 1101(3), represented only between one-half and one percent of the business reorganization cases in chapters X and XI in the years 1975–77. But these cases, though few in number, represented over 90 percent of the total assets and liabilities of all cases with a substantial public investor interest. It is only for such public companies that the bill reenacts the few basic safeguards of chapter X. In all other respects, the administration of debtor estates for public companies will be governed by the provisions in chapters 3, 5 and 11 that are intended for all cases, public and non-public companies alike.

The Committee believes that it should be emphasized that investor protection is most critical when the company in which the public invested is in financial difficulties and is forced to seek relief under the bankruptcy laws. A fair and equitable reorganization, as provided in the bill, is literally the last clear chance to conserve for them values that corporate financial stress or insolvency have placed in jeopardy. As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional creditors who will have their own best interest to look after. Commenting on the need and importance of a disinterested trustee in public cases, Harold J. Tyler, Jr., a distinguished former Federal judge experienced in bankruptcy reorganization, said (Senate Hearings, supra, p. 900) that only the trustee "can be expected to look out for the debt and equity holds. Creditors and their lawyers usually do not do so, and debtors in possession are inclined to think first of satisfying their big creditors."

5796

3

**EXHIBIT B**



**U.S. SECURITIES AND EXCHANGE COMMISSION**
**NEW YORK REGIONAL OFFICE**
*200 Vesey Street, Suite 400*
*New York, New York 10281-1022*

*Alan S. Maza*
*Senior Bankruptcy Counsel*
*Division of Enforcement*

*Direct Line:*  (212) 336-0133
*Facsimile:*  (212) 336-1320
*E-mail:*  mazaa@sec.gov

October 7, 2016

**By Email and U.S. Mail**
Susan D. Golden, Esq.
Office of the United States Trustee
201 Varick Street, Suite 1006
New York, NY  10014
Susan.Golden@usdoj.gov

RE:  Breitburn Energy Partners LP, et al.; Bankr. Case No. 16–11390-SMB (SDNY)

Dear Ms. Golden:

Pursuant to Section 1109(a) of the Bankruptcy Code, the Securities and Exchange Commission ("SEC") may raise, and may appear and be heard on, any issue in a Chapter 11 case. The SEC staff has been monitoring the above-referenced case, and believes that the appointment of an equity committee to represent public shareholders is appropriate here.  Consistent with case law, the staff considers the following factors in assessing whether an equity committee should be appointed: (i) whether the debtor appears to be hopelessly insolvent; (ii) whether the debtor's securities are widely held; (iii) the complexity of the case; (iv) the likelihood that shareholders will receive a distribution; (v) whether the cost to the estate of the committee significantly outweighs the need for adequate representation; and (vi) whether shareholders can be adequately represented by other participants in the case.

This case easily satisfies the factors involving complexity and whether the securities are widely held because Breitburn Energy Partners, LP, et al. ("Breitburn" or "Debtors") is undisputedly a large public company with a complex business and debt structure.  The Debtors' consolidated assets and liabilities as of March 31, 2016 were approximately $4.71 billion and $3.41 billion, respectively.[1]  Prior

---

[1] *See* Declaration of James G. Jackson Pursuant to Local Bankruptcy Rule 1007-2 and In Support of The Debtors' Chapter 11 Petitions and First Day Relief ¶¶ 8, 18 [ECF No. 13].

*Susan D. Golden*
*October 7, 2016*
*page 2*

to the petition date, Breitburn had approximately 213.7 million common units and 57.4 million preferred units outstanding, which appear to be widely held among hundreds of beneficial holders.[2]

With respect to the hopeless insolvency prong,[3] the Debtors' financials indicate that the Debtors do not appear to be hopelessly insolvent here. The balance sheet as of the petition date shows more than $1.3 billion in stockholder equity. Even post-petition, in the Debtors' most recently filed Monthly Operating Report for the period ending August 31, 2016, the Debtors' balance sheet reflects an estimated $985 million in stated equity.[4] At this time, Breitburn has not filed a plan of reorganization, but these numbers suggest that it is likely there will be some distribution available for shareholders. In a case that will likely involve a heavily negotiated plan of reorganization, the extent of any shareholder distribution could be determined by whether shareholders have adequate representation during the plan negotiation process.

Finally, the cost to the estate of the committee will not significantly outweigh the need for adequate representation and shareholders cannot be adequately represented by other participants in this case. The cost for equity committee professionals should be small relative to the size of the case. By comparison, the Debtors and the creditors have retained multiple professionals under §327 of the Code including lead counsel, an investment banker, a claims and noticing agent, a financial advisor, a conflicts counsel, a special counsel, a special litigation counsel and an auditor and tax advisor. With other parties receiving this level of representation in a complex case, it would be unfair to say that it would be too costly for the estate to pay for any representation of shareholders.

The staff does not believe that shareholder interests will be adequately represented by other participants in the case. As noted above, the stock is widely held and, while certain shareholders are seeking appointment of an equity committee, it would be unfair to demand that these shareholders continue to bear the costs of representation to address all the relevant issues that arise during the course of these proceedings. In a case of this size and complexity, it is unlikely that any single shareholder or group of shareholders would have sufficient resources to adequately represent the interests of all. As for management, it is the staff's view that equity-owning officers and directors generally cannot adequately represent shareholders due to their conflicting fiduciary duties to creditors in a bankruptcy and other possible conflicts of interest (i.e. management incentive and retention plans). Here, it appears that management may not be in a position to adequately represent shareholders for the additional reason that shareholders are likely to face the tax consequences of cancellation of debt income.

---

[2] *See* Form 10Q, dated May 6, 2016

[3] *See* Judge Bernstein's Memorandum Decision and Order Denying Appointment of an Official Committee of Equity Security Holders in Sunedison, Inc. et al., Chapter 11 Case No. 16-10992-SMB (SDNY)( 8/12/2016), page 19. The court notes that on "the issue of solvency, a court need not conduct an exhaustive valuation; rather, the relevant inquiry is whether a debtor appears to be hopelessly insolvent." *Id.* at 13 *citing Eastman Kodak*, 2012 WL 2501071, at 3.

[4] *See* Monthly Operating Report for Reporting Period August 1, 2016 through August 31, 2016, page 6 [ECF No. 604].

*Susan D. Golden*
*October 7, 2016*
*page 3*

For all these reasons, the SEC staff believes that public shareholders in this case would benefit from representation by an equity committee. Such a committee's contributions, through qualified professionals, could provide a substantial benefit to the estate and ultimately maximize value for all parties involved.

I appreciate your time and attention to this request.     If you have any questions, please do not hesitate to contact me at the above number.

Sincerely,

*/s/ Alan S. Maza*

Alan S. Maza

Cc:  Martin J. Bienenstock, Esq. (Counsel for Certain Holders of Equity Securities)(via email)
   Vincent Indelicato, Esq. (Counsel for Certain Holders of Equity Securities)(via email)
   Stephen Karotkin, Esq. (Counsel for Debtors)(via email)
   Gregory Allan Bray, Esq. (Counsel for Official Committee of Unsecured Creditor)(via email)

**References**

---

[i] *See* Debtors' Disclosure Statement, available via
https://www.sec.gov/Archives/edgar/data/922358/000110465920138362/tm2039038d1_ex99-1.htm

[ii] *See* Debtors' First Quarter 2021 Results, available via
https://www.sec.gov/Archives/edgar/data/922358/000110465920135485/tm2037991d1_ex99-1.htm

[iii] *See* Debtors' Cleansing Materials, Form 8-K dated December 10, 2020, available via
https://www.sec.gov/Archives/edgar/data/922358/000110465920134531/tm2038265d1_ex99-1.htm

[iv] *See* Debtors' Press Release Dated 05/01/2014, available via
https://www.globenewswire.com/news-release/2014/05/01/632275/10079488/en/Ferrellgas-to-Establish-Midstream-Division-With-Agreement-to-Acquire-Sable-Environmental-Purchase-Demonstrates-Partnership-s-Commitment-to-Diversification.html

[v] *See* Debtors' Press Release Dated 06/01/2015, available via
https://www.globenewswire.com/news-release/2015/06/01/740879/10136689/en/Ferrellgas-Partners-to-Acquire-Bridger-Logistics-Announces-Distribution-Increase.html

[vi] *See* Debtors' Press Release Dated 08/01/2018, available via
https://www.globenewswire.com/news-release/2018/08/01/1545902/0/en/Ferrellgas-Partners-L-P-Completes-Sale-of-Remaining-Bridger-Operations-and-Global-Sourcing-Business.html

[vii] *See* Hansen v. Ferrellgas Partners, L.P. et al., No. 1:16-cv-07840-RJS (S.D.N.Y.) (filed Oct. 6, 2016); Eddystone Rail Co., LLC v. Bridger Logistics, LLC et al., No. 2:17-cv-00495 (E.D. Pa.) (filed Feb. 2, 2017); Pierce v. James Ferrell et al., No. 2:17-cv-02160-JWL-GEB (D. Kan.) (filed Mar. 16, 2017).

[viii] *See* Debtors' Form 8-K dated December 30, 2020, available via:
https://www.sec.gov/Archives/edgar/data/922358/000110465921000957/tm211534d1_8k.htm

[ix] *See* Debtors' Cleansing Materials, Form 8-K dated December 10, 2020, at p. 6, available at:
https://www.sec.gov/Archives/edgar/data/922358/000110465920134531/tm2038265d1_ex99-1.htm

[x] *See* Ferrellgas Partners, L.P. Form 10-K for the quarterly period ended October 31, 2020, at p. 72, available via:
https://www.sec.gov/Archives/edgar/data/922358/000155837020011490/fgp-20200731x10k.htm

[xi] *See* Debtors' Disclosure Statement, Exhibit D (Feasibility and Plan Value), available via
https://www.sec.gov/Archives/edgar/data/922358/000110465920138362/tm2039038d1_ex99-1.htm

[xii] *See* Debtors' Form 8-K, dated December 15, 2020, available via:
https://www.sec.gov/Archives/edgar/data/922358/000110465920135485/tm2037991d1_ex99-1.htm

[xiii] *See* United States Energy Information Administration, "This Week in Petroleum." Dated 01/27/21, available via: *https://www.eia.gov/petroleum/weekly/propane.php*

xiv *See Debtors' Cleansing Materials, Form 8-K dated December 10, 2020, at p. 6, available at:* https://www.sec.gov/Archives/edgar/data/922358/000110465920134531/tm2038265d1_ex99-1.htm

xv *See Debtors' Cleansing Materials, Form 8-K dated December 10, 2020, at p. 6, and Debtors' Form 10-Q for the quarterly period ending October 31, 2020, available at:* https://www.sec.gov/Archives/edgar/data/922358/000110465920134531/tm2038265d1_ex99-1.htm
https://www.sec.gov/Archives/edgar/data/922358/000155837020014376/fgp-20201031x10q.htm

xvi *See Debtors' Cleansing Materials, Form 8-K dated December 10, 2020, at p. 6, and  Debtors' Form 10-Q for the quarterly period ending October 31, 2020, available at:* https://www.sec.gov/Archives/edgar/data/922358/000110465920134531/tm2038265d1_ex99-1.htm
https://www.sec.gov/Archives/edgar/data/922358/000155837020014376/fgp-20201031x10q.htm

xvii *See Debtors' COO SEC Form 3, "No securities are beneficially owned" available via:* https://www.sec.gov/Archives/edgar/data/922358/000117911019008888/xslF345X02/edgar.xml
CFO SEC Form 3, "No securities are beneficially owned" available via:
https://www.sec.gov/Archives/edgar/data/922358/000117911020010973/xslF345X02/edgar.xml
CSO SEC Form 3, "No securities are beneficially owned" available via:
https://www.sec.gov/Archives/edgar/data/922358/000117911020001506/xslF345X02/edgar.xml
GC SEC Form 3, "No securities are beneficially owned" available via:
https://www.sec.gov/Archives/edgar/data/922358/000117911019008887/xslF345X02/edgar.xml

xviii *See Debtors' Form 10-K for Fiscal Year Ending July 31, 2020, at p. 95, available via:* https://www.sec.gov/Archives/edgar/data/922358/000155837020011490/fgp-20200731x10k.htm#ITEM12SECURITYOWNERSHIPOFCERTAINBENEFICI

xix *See Debtors Form 10-K for Fiscal Year Ended July 31, 2020, at p. 96, available via:* https://www.sec.gov/Archives/edgar/data/922358/000155837020011490/fgp-20200731x10k.htm
*See Debtors Form 10-K for Fiscal Year Ended July 31, 2015, at p. 68, available via:* https://www.sec.gov/Archives/edgar/data/922358/000092235815000016/fgp_20150731x10k.htm

xx *Section 6.10(d) of the Fifth Amended and Restated Partnership Agreement of Limited Partnership of Ferrellgas Partners, L.P. provides:*
Any standard of care and duty imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited as required to permit the General Partner to act under this Agreement or any other agreement contemplated by this Agreement and to make any decision pursuant to the authority prescribed in this Agreement so long as such action is reasonably believed by the General Partner to be in, or not inconsistent with, the best interests of the Partnership.

xxi *See Debtors' Form 10-K for Fiscal Year Ending July 31, 2020, at p. 46.* "The partnership agreements expressly permit the general partner to resolve conflicts of interest between itself or its affiliates, on the one hand, and the company and its unitholders, on the other, and to consider, in resolving such conflicts of interest, the interests of other parties in addition to the interests of the unitholders. By the terms of the partnerships agreements, a purchaser of common units is deemed

to have consented to specified conflicts of interest and actions of the general partner and its affiliates that might otherwise be prohibited, including those described above, and to have agreed that such conflicts of interest and actions do not constitute a breach by the general partner of any duty stated or implied by law or equity."

[xxii] *See* Debtors' Form 10-K for Fiscal Year Ending July 31, 2015, at p. 47, available via: https://www.sec.gov/Archives/edgar/data/922358/000092235815000016/fgp_20150731x 10k.htm

[xxiii] *See* Debtors' Complaint for Declaratory Judgment, Injunctive and Other Relief, *Ferrell Companies, Inc., as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan v. GreatBanc Trust Company, Directed Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust*, Case No. 2:19-CV-2656 (D. Ct. Kansas) ("2019 ESOP Trustee Action").

[xxiv] *See* 2019 ESOP Trustee Action, *GreatBanc Trust Company's Verified Answer, Defenses to Plaintiff's Complaint and Counterclaims.*

[xxv] *See* Debtors' Disclosure Statement, at p. 92, available via: https://www.sec.gov/Archives/edgar/data/922358/000110465920138362/tm2039038d1_ ex99-1.htm

[xxvi] *See* Debtors' Disclosure Statement, at p. 1, available via: https://www.sec.gov/Archives/edgar/data/922358/000110465920138362/tm2039038d1_ ex99-1.htm

[xxvii] *See* Debtors' Cleansing Materials, Form 8-K dated December 10, 2020, at p. 5, available at: https://www.sec.gov/Archives/edgar/data/922358/000110465920134531/tm2038265d1_ ex99-1.htm

[xxviii] *See* Debtors Form 10-K for Fiscal Year Ended July 31, 2020, at p. 63, available via: https://www.sec.gov/Archives/edgar/data/922358/000155837020011490/fgp-20200731x10k.htm

[xxix] *See* Debtors' Form 10-Q for the quarterly period ending October 31, 2020, at p. 3, available via: https://www.sec.gov/Archives/edgar/data/922358/000155837020014376/fgp-20201031x10q.htm

[xxx] *See* Debtors' Form 10-Q for the quarterly period ending October 31, 2020, available via: https://www.sec.gov/Archives/edgar/data/922358/000155837020014376/fgp-20201031x10q.htm

[xxxi] *See* Debtors' Disclosure Statement, Exhibit D (Feasibility Analysis & Plan Value), available via: https://www.sec.gov/Archives/edgar/data/922358/000110465920138362/tm2039038d1_ ex99-1.htm